## Clark v. Commonwealth.
(Decided Oct. 8, 1937.)

116

E. BERTRAM for appellant.

HUBERT MEREDITH, Attorney General, and W. OWEN KELLER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Reversing.

Under an indictment charging appellant Herman Clark, with the murder of General Anderson, he was tried and found guilty of voluntary manslaughter and sentenced to twelve years in the penitentiary. Appellant's motion for a new trial was overruled and judgment entered. He appeals.

While five grounds in support of the motion for a new trial were presented to the court below, counsel in his argument has abandoned all save one, i. e., that the court did not give the whole law of the case, and committed prejudicial error in the instructions given, because as is said, the proof did not justify their substance.

The accused was a son-in-law of Link Anderson a brother of deceased. Will Gregory, who was in the company of deceased at the time of the homicide was a son-in-law of General Anderson. Gregory was an eyewitness, as was also Victor Coffey, a stepson of Clark. Accused lived on a farm owned by Link Anderson; General Anderson owned and lived upon an adjoining farm. Appellant had lived on the Link Anderson farm for about five years prior to the date upon which the shooting occurred. For two or three years there had existed a bitter feeling between appellant and deceased. The record is replete with threats on the part of Clark to kill deceased; some made directly, others uncommunicated threats on the part of each to kill the other, all growing out of the trivial matter which finally culminated in the homicide.

The record shows that there was a roadway run-

ning along the boundary of the Link Anderson farm. We gather by inference only, that this was a public road, such proof as bears on this point being vague and indefinite, the nearest to definite proof being that General Anderson was road overseer for the road at the time. It further appears that some time in the spring of 1936 the water was not being properly carried off from a low point in the road, and in order to provide proper drainage and to prevent the water from running laterally with the road, a ditch or drain was made leading to the Link Anderson fence, and a ditch or drain was then made in the Anderson field which extended for 12 or 15 feet, described as being 12 inches wide and 12 inches deep. The description of this means of directing the water flow is very conflicting and not proven (as far as the record discloses) in even a partially satisfactory manner. We say this because after a close reading of the proof we are unable to determine the nature or character of the means of flowing the water. Some witnesses say that inside the fence the ditch was as we have described above; others say there was no ditch in appellant's field, that it was a gully made by the turning of the water toward a certain point in the field. Nor is it gathered from the proof who or what officer, if any, dug the drain on the outside, or the ditch or drain on the inside of appellant's fence. We may infer from some proof that the overseer performed the entire work. We also may infer from other proof that whatever was done on the inside of the fence was done by appellant. There is an entire lack of positive or satisfactory proof that General Anderson, as overseer did the work, or had it done under his supervision, although from the proof the ditch was frequently cleaned out, and just as frequently filled up, the two activities being the casus belli. We do learn from the record that the filling of the ditch at intervals was by appellant.

Several days prior to the shooting General Anderson applied to the county attorney (as he had done on other occasions) to write a warrant charging appellant with the offense of obstructing a public ditch. The county attorney, on the last application, advised him that an affidavit was a necessary prerequisite. The deceased declined to comply, since he could not say that he had ever seen appellant in the act of obstructing the ditch. At that conference General Anderson was ad-

vised that since he was an officer he could make an arrest with a proper warrant, or without same if a misdemeanor was being committed in his presence.

Shortly after the visit to the county attorney, William Gregory, who lived in the adjoining county of McCreary, visited his father-in-law, the deceased. On August 19, the two spent the day in hunting squirrels. They remained out all night, and the next morning renewed the squirrel hunt until almost sundown. During a part of this day they were accompanied by Hobart Anderson, a son of deceased, all carrying guns, and Gregory having a large caliber pistol. Upon their return to deceased's home late in the afternoon, for some reason not disclosed by Gregory, the two proceeded toward the location of the troublesome ditch. About the time they approached a point near the ditch they heard a noise from the discharge of a shotgun, and proceeded to a point near where the drain ran into appellant's field.

The appellant on the same afternoon, had taken his shotgun and gone into a nearby field for the purpose of shooting ground hogs. He remained there until almost dark and went home. He and his wife then went down to the "milk gap" where his wife engaged in milking the cow. Appellant proceeded toward the ditch, followed by his young stepson, Victor Coffey. On their way to the point mentioned, appellant saw and accosted Hobart Anderson, asking him if he had cleaned out the ditch, Anderson replying in the negative. Appellant, still accompanied by Coffey, proceeded toward the ditch.

From this point the evidence is extremely conflicting in the main, and somewhat so in incidental or less important details. There is no doubt that when appellant went to the ditch he found it cleared; nor is there doubt that he at once proceeded to fill up some part of it by throwing in brush and pushing some stone in the place where the water ran under his boundary fence. He admits same, and the boy testifies likewise. Both say that he did not place any obstruction in the ditch outside his fence line. No testimony sufficiently tends to prove otherwise.

Gregory was the only eyewitness for the Commonwealth, and, beyond circumstances and nonsubstantive evidence, the Commonwealth relied on his evidence in making its case. He states in detail what has been re-

counted above as to movements of himself and deceased up to this point. His evidence, in substance, is as follows: When the two returned to Anderson's home about supper time, some mention was made of the drain, the court not permitting the conversation. He and deceased at once started toward the ditch, and when they got to within 25 or 30 yards of the fence he heard somebody throw a rock in the ditch. On cross-examination he said:

"I heard a noise.

"Q. You did not see any one drop a stone? A. No, sir.

"Q. You didn't know who dropped it or where? A. I knowed it was in the ditch. I don't know who dropped it, but I had a good idea.

"Q. And General didn't know who dropped it? A. Not pine blank.

"Q. Neither of you saw anybody drop anything? A. No, sir."

Witness further details that when deceased reached the fence, appellant was seen to be leaving the ditch and going toward an oak tree; that General Anderson twice said, "Consider yourself under arrest for filling up the ditch." Appellant then moved rapidly from the oak tree toward a log or stump, and deceased called, "Halt." Appellant said, "G. D. you," and at once fired. He thinks there were four or five shots fired, the first a shotgun and others a pistol. Gregory says when appellant shot at him he began firing back. This shooting resulted in the deceased receiving the discharge from appellant's shotgun in his face, arms, and hands. He died from the effects on the following day. Gregory was slightly wounded, as was appellant.

Appellant admits that he filled up the drain prior to the time deceased and Gregory came up, in the manner above detailed, insisting, however, that such filling was only within his boundary. As to the details of the encounter, his evidence and the evidence of young Coffey do not differ materially. Their proof is to the effect that after appellant had filled up the ditch and was leaving, some person or persons approached (it being too dark as appellant says to tell who they were) and some one cried "Halt" and immediately began firing at him, whereupon he returned the fire, shooting only once

with his shotgun. He says his firing was done toward the point where he saw the flash from his opponent's weapon. The statement that it was too dark to recognize the opposing parties is not borne out by the boy's evidence.

On these facts the court, in substance, instructed the jury that General Anderson was at the time of the shooting a duly qualified constable in magisterial district No. 5, and that, if accused did on the occasion "in the presence of said General Anderson, and while he was constable as aforesaid * * * commit the public offense of obstructing a ditch upon the right of way of a public highway," mentioned in instruction No. 4, then it was the right and duty of Anderson to at once arrest him, and, if the jury should believe beyond a reasonable doubt that, when Anderson was undertaking the arrest, the appellant, in undertaking to prevent the arrest, willfully and feloniously and of malice aforethought shot and killed Anderson, the jury should find him guilty of murder and fix his penalty at death or imprisonment for life.

Instruction No. 2 embodied the law of voluntary manslaughter, if the killing was done under the same circumstances without malice or more violence than appeared to be necessary was used in making the arrest. Instruction No. 3 was the usual and ordinary reasonable doubt and lesser degree instruction.

Instruction No. 4 told the jury that, if the defendant obstructed a ditch in the right-of-way of a "public highway" in the presence of Anderson, such acts constituted a public offense, and he (Anderson) had the right to arrest.

Instruction No. 5, a self-defense instruction, was such as is ordinarily given, except that it embodied the idea that, if Anderson was attempting the arrest and defendant did not forcibly resist, and that Gregory or Anderson began the attack when he was not attempting to evade arrest, appellant should be acquitted on grounds of apparent necessary self-preservation.

Instruction No. 6 was a definition of what in law, viewed by the trial court, constituted an offense committed "in his presence," as used in other instructions. Others given were definitive of technical legal terms.

It is not contended that there was a lack of suf-

ficient evidence presented by the Commonwealth to carry the case to the jury. There was sufficient proof to justify submission. But counsel argues there was a lack of sufficient proof to justify any instruction authorizing the jury to consider, in weighing defendant's guilt, the right of the officer to use force in making arrest for an offense not proven to have been committed in his presence, and (2) error in assuring the jury by instruction that General Anderson was at the time a constable, a peace officer. The last objection is urged by argument of counsel, because there was no record proof of the officership. This is true, and no doubt a record showing General Anderson to have been qualified at the time would be considered the "best evidence."

No less than five or perhaps six persons say that General Anderson was at the time the constable in his district. The county attorney says he was an officer; in fact appellant himself admits that at the time he knew that General Anderson was a constable. We observe that no objection was voiced either to questions eliciting this proof or to the answers given. So on this point we must hold that appellant's objection is untenable.

The first objection to the instructions is meritorious. We have considered the transcript carefully in an effort to find, if possible, any evidence which would do more than create a mere inference that, at the time of the alleged arrest and consequent shooting, appellant had committed a public offense in the presence of the peace officer. In concluding thus, it is hardly necessary to repeat the proof which we have given above in substantial detail, nor to point out otherwise than in a general way the lack of proof. We may repeat that there was very meager proof that the road in question was a public highway.

There is a lack of proof that the ditch or drain into appellant's field had been opened, or at any time cleared out, by one having authority so to do. There is almost complete failure of proof such as would show that appellant did more than stop up some sort of ditch or drain on his own premises. Therefore, taken in its strongest import, we must conclude that there was lack of proof sufficient to justify the court in submitting to the jury the right of the officer to make an arrest of appellant if he were obstructing a ditch upon the right-of-way, in the presence of the officer.

122

We are forced to the conclusion that all of the instructions embodying this feature were erroneous and of substantial prejudice to appellant. On the whole record, as presented to us, we express the opinion that, under all the facts and circumstances shown by the record, a case was presented where no more than the usual and ordinary homicide instructions should have been given. What may develop or be developed on another trial we can not surmise, hence we shall not undertake to incorporate any suggestions as to instructions on another hearing.

Judgment reversed, with directions to award appellant a new trial consistent with the foregoing.